UNITED STATE DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| AHMED REHAB,<br><br>　　　　Plaintiff,<br><br>v.<br><br>X CORP. and xAI,<br><br>　　　　Defendants. | Case No. 4:26-CV-00105 |

# COMPLAINT

NOW COMES, Ahmed Rehab, by and through the undersigned attorneys, and brings this complaint against X Corp. and xAI seeking injunctive relief and damages and in support thereof states as follows:

## PARTIES

1. Plaintiff, Ahmed Rehab ("Mr. Rehab") is a resident of the State of Illinois and a subscriber to X Corp.'s premium services.

2. Defendant, X Corp. is the company that operates the X social media platform, formerly known as Twitter.

3. X Corp. is a wholly owned subsidiary of Defendant xAI.

4. X Corp. is headquartered in Bastrop, Texas.

## JURISDICTION AND VENUE

5. X's Terms of Service establish that "[a]ll disputes related to these Terms or the Services…will be brought exclusively in the U.S. District Court of the Northern District of Texas or state courts located in Tarrant County, Texas, United States, and you consent to personal jurisdiction in those forums."

6. Mr. Rehab is a resident of Illinois and X Corp and xAI are headquartered in Texas so there is diversity between the parties.

7. Mr. Rehab seeks greater than $75,000.00 in damages.

8. Jurisdiction and Venue are therefore proper.

## FACTS

9. Since around December 2009, Mr. Rehab has been a user of X with the username @Ahmed_Rehab. Mr. Rehab's account includes two photos of Mr. Rehab, a brief description of who he is, and a link to his personal website.

10. The email Mr. Rehab used to create his account was unchanged for the nearly 16 years he operated the account.

11. Mr. Rehab uses a unique, strong password for his X account.

12. Mr. Rehab, the Executive Director of CAIR-Chicago, has amassed over 10,000 followers through his pointed commentary on social justice, discrimination, Islamophobia, world events, and U.S. politics.

13. Mr. Rehab is a public figure and has appeared on television shows, radio shows, and podcasts to discuss current events related to the aforementioned subjects.

14. Mr. Rehab, like other public figures, uses his X account to share his opinions and inform his followers about his work, including his work as Executive Director. His linked website also provides further contact and booking information should someone wish to schedule Mr. Rehab's appearance on a particular program.

15. In or around December 2024, Mr. Rehab paid $114.99 to have a blue check mark added to his account.

16. To obtain the blue check mark annual subscription, Mr. Rehab had to demonstrate his account profile and photo was set, unchanged, and active, and that the account had "clean behavior". More importantly, Mr. Rehab had to confirm his phone number on file to authenticate his identity.

17. The subscription is in the final month.

18. On or around August 6, 2025, X sent an email to Mr. Rehab's Yahoo email account – the email address used to create the account. The email stated there was a new log in to his X account.

19. Mr. Rehab did not see the email immediately.

20. On August 8, 2025, Mr. Rehab was able to successfully log into his account and post content. At that time, there was no suspicious activity on the account.

21. From August 9, 2025 to August 12, 2025, Mr. Rehab did not attempt to log on or post on his X account.

22. On or around August 12, 2025, Mr. Rehab received an email from X that stated that the email address for his account had been changed. The email was sent to his Yahoo address.

23. On or around August 13, 2025, Mr. Rehab attempted to log into X and was denied access.

24. When he attempted to change his password, he was informed that the two-step authorization would be sent to a new, unknown email address.

25. Mr. Rehab attempted repeatedly to contact X via the app, but the system was non-operational and returned an error message each time.

26. Mr. Rehab next visited X's online "Help Center" and contacted X support through the link for hacked accounts to explain what happened and attempted to regain access to his account.

27. Within hours of Mr. Rehab's request via the Help Center, X responded via email that X was "unable to verify you as the account owner". *See* August 13, 2025 email.

28. The email response was sent to Mr. Rehab's Yahoo email address.

29. Despite Mr. Rehab having shared evidence that the email was changed without his permission, and that his account had been hacked, X ignored the evidence and failed to conduct its own investigation.

30. Despite the email starting with "reply above this line", it ended with, "Please do not respond to this email as replies to this account are not monitored" which disrupted Mr. Rehab's attempts to continue communication with X. *See* August 13, 2025 email.

31. On or around August 15, 2025, counsel for Mr. Rehab sent a letter to X Corp. requesting that Mr. Rehab's account be restored within seventy-two (72) hours; X Corp. still has not responded.

32. Upon information and belief, a simple search by X would have revealed that Mr. Rehab's account was hacked.

33. X could have also texted Mr. Rehab's phone number which, on information and belief, had not been changed up to that point, and would have been a mechanism to confirm his identity and authenticate his account.

34. Viewing the X page itself would have confirmed that the account was hacked because of how different the subjects and tone of the posts and reposts were.

35. The person who hacked Mr. Rehab's X account has posted and reposted content that undermine Mr. Rehab's reputation in the community, including posts that are in opposition to Mr. Rehab's political beliefs as well as dozens of posts about meme coins

and cryptocurrency. Some of these posts appear to be solicitations to buy specific types of cryptocurrency.

36. The posts have led to supporters, acquaintances, and community members reaching out to Mr. Rehab expressing their disappointment and frustration with Mr. Rehab's posts.

37. This happened during a crucial time for Mr. Rehab and his organization because it was "fundraising season", the period of the year in which CAIR-Chicago solicits most of the donations that sustain the organization and keep it operational.

38. X's Rules and Policies state that if a user's account is compromised and log-in is not possible, the user should contact X via Help Center support; that is what Mr. Rehab did.

39. X Rules and Policies state, "[t]he unauthorized access or modification of someone's X account is strictly prohibited." *See* X Rules and Policies.

40. Yet, X has made no effort to enforce that policy nor return Mr. Rehab's account back into his control.

41. X Rules and Policies state, "You may not impersonate individuals…to mislead, confuse, or deceive others" yet X is presently allowing Mr. Rehab to be impersonated. *See* X Rules and Policies.

42. X's Rules and Policies are incorporated into the Terms of Service, the contract that all X users agree to when signing up for the platform.

43. X is violating that contract and being unjustly enriched by allowing Mr. Rehab's paid account to remain in the control of a hacker who is impersonating Mr. Rehab.

44. Mr. Rehab paid X for a blue check mark that his hacker benefited from.

## COUNT I: BREACH OF CONTRACT

45. Plaintiff restates and realleges paragraph 1 through 44 as if pleaded herein.

46. The Terms of Service and the incorporated Rules and Policies constitute a contract between X Corp. and Mr. Rehab that X Corp. describes as "a legally binding contract". *See* X Terms of Service.

47. Additionally, Mr. Rehab paid for X's premium services.

48. Mr. Rehab bought the premium services and the blue check mark that comes with it because of X's verification and ability to get his message out to a wider audience with added services.

49. In its Rules and Policies, X warrants that "[X] do[es] not allow any activity that attempts to manipulate our platform or disrupt our services."

50. X's strict prohibition on unauthorized access to another user's account and its promise to not allow that activity amounts to a contractual obligation to undergo the necessary investigation to determine whether an account is hacked and then take measures to restore the account to the rightful user.

51. X's prohibition on impersonation and its contractual promise to prevent impersonating activity creates an obligation to undertake preventative measures when a user provides evidence that their account was hacked, and they are being impersonated.

52. Those obligations are enhanced by the fact that Mr. Rehab pays for X's blue check mark which is meant to verify the identity of the account and increases the likelihood that users and followers will trust the veracity of the post.

53. Mr. Rehab relied on X's ability to enforce its own policies when he paid for the premium services that X provides.

54. By failing to exercise reasonable care to mitigate the hack and impersonation, X breached its duty to Mr. Rehab to prevent "activity that attempts to manipulate [X's] platform or disrupt [X's] services through inauthentic accounts, behaviors, or content."

55. X's breach has injured Mr. Rehab because he has already paid for an account that is now run by an imposter and the account's posts are upsetting potential donors during the biggest donation period of Mr. Rehab's year, thus damaging Mr. Rehab's reputation and standing in his community.

WHERFORE, Plaintiff respectfully prays that this Court:

A. Grant a preliminary and permanent injunction ordering X to return Plaintiff's account @Ahmed_Rehab into his control;

B. Award $114.99 in damages;

C. Award attorney's fees; and

D. Award any and all other relief this court deems just and equitable.

## COUNT II: VIOLATION OF TEXAS'S DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT

56. Plaintiff restates and realleges paragraph 1 through 44 as if pleaded herein.

57. Mr. Rehab is a "Consumer" as defined by Texas's Deceptive Trade Practices-Consumer Protection Act (hereinafter "DTPA"). TX BUS & COM § 17.45(4).

58. X's services and application are "Services" as defined by the DTPA. TX BUS & COM § 17.45(2).

59. The DTPA prohibits "false, misleading, or deceptive acts or practice in the conduct of any trade or commerce". TX BUS & COM § 17.46(a).

60. False, misleading, or deceptive acts include, "causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another". TX BUS & COM § 17.46(b)(3).

61. False, misleading, or deceptive acts also include, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not". TX BUS & COM § 17.46(b)(3).

62. Via the blue check mark, X is misrepresenting to its users that Mr. Rehab is still in control of his account and is the person posting and reposting on the account.

63. Blue check marks are meant to be a definitive statement and a warranty of the legitimacy of the account which Mr. Rehab and his followers rely on.

64. X ignored its own representations about maintaining the veracity of an account when it failed to check Mr. Rehab's phone number or search its records for his email address – an email address that X used to correspond with Mr. Rehab and that had been Mr. Rehab's account email address for nearly 16 years.

65. By failing to investigate or correct the hacking of Mr. Rehab's account and allowing his continued impersonation on its platform, X is deceiving Mr. Rehab's 10,000-plus followers and the uncounted number of other X users who are currently coming across or interacting with the impersonator's posts.

66. Mr. Rehab does not approve of nor does he want to be connected to the posts and reposts since the hacking that X allows to remain up and associated with the account and its blue check mark.

67. Because of X's failure to even attempt to remedy the impersonation of Mr. Rehab's account, Mr. Rehab is suffering daily reputational harm. *Houston Livestock Show and Rodeo Inc. v. Hamrick*, 125 S.W.3d 555, 583 (Ct. App. Tx. 2003) ("Appellees' injury-to-reputation damages are recoverable as actual damages under the DTPA.").

68. Mr. Rehab's standing in the community and his ability to book appearances and fundraise for his organization are impeded by X's continued denial of access to his account.

WHERFORE, Plaintiff respectfully prays that this Court:

A. Grant a preliminary and permanent injunction ordering X to return Plaintiff's account @Ahmed_Rehab into his control;

B. Award at least $75,000.00 in damages;

C. Award attorney's fees; and

D. Award any and all other relief this court deems just and equitable.

## COUNT III: UNJUST ENRICHMENT

69. Plaintiff restates and realleges paragraph 1 through 44 as if pleaded herein.

70. "Unjust enrichment occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tx. Ct. App. 2013).

71. X has passively received a benefit in the form of Mr. Rehab's payment for one year's worth of premium services which they are no longer providing eight (8) months into the term of the contract.

WHERFORE, Plaintiff respectfully prays that this Court:

A. Grant a preliminary and permanent injunction ordering X to return Plaintiff's account @Ahmed_Rehab into his control;

B. Award $114.99 in damages;

C. Award attorney's fees; and

D. Award any and all other relief this court deems just and equitable.

## COUNT IV: NEGLIGENCE

72. Plaintiff restates and realleges paragraph 1 through 55 as if pleaded herein.

73. X Corp. has a duty to act reasonably once notified that an account has been hacked.

74. The duty is established in its own terms of service. *See* paragraphs 46-53 supra.

75. The hacking of social media accounts is well-known issue that social media companies address on a regular basis. *See* Kurt Knutsson, Elmo hack exposes serious social media cybersecurity threats, Fox News, published July 20, 2025 6:00am, Elmo X account hack shows no social media brand is safe from cybercriminals | Fox News.

76. X Corp. failed to act reasonably when it failed to investigate Mr. Rehab's complaint, failed to use his verified cell phone as alternative verification, and failed to ensure the in-app reporting system was operational.

77. Upon information and belief, X Corp. could have easily accessed and cross-referenced Mr. Rehab's actual email address – the one they used to email him that they could not verify he had been hacked.

78. Upon information and belief, X Corp. requires that users paying for blue check marks verify their phone number in order to offer a secondary process for verifying the account and regaining control should it be hacked.

79. No effort was made to use Mr. Rehab's cell phone number to prove his authenticity.

80. X Corp.'s breach of duty has caused Mr. Rehab serious reputational harm, caused significant donor confusion during fundraising season, and hampered Mr. Rehab's ability to book himself on programs.

WHERFORE, Plaintiff respectfully prays that this Court:

A. Grant a preliminary and permanent injunction ordering X to return Plaintiff's account @Ahmed_Rehab into his control;

B. Award at least $75,000.00 in damages;

C. Award attorney's fees; and

D. Award any and all other relief this court deems just and equitable.

Respectfully submitted this 2nd day of February, 2026,

*/s/ Samira Elhosary*
Samira S. Elhosary
Bar No. 211214026
Muslim Legal Fund of America
100 N. Central Expy. Ste. 1010
Richardson, TX 75080
972-914-2507
selhosary@clcma.org

Noah Halpern
(*pro hac vice* application forthcoming)
ARDC #6342199
CAIR-Chicago
17 N. State Street Suite 1500
Chicago, Illinois, 60602

*Attorneys for Plaintiff*